Judy POWELL, John L. Luther, Bobbe Alexander, Judy Broussard, Gene Ryder and Ana Bergh, Appellants,

v.

Roger E. FOXALL, Appellee.

No. 09–01–279 CV.

Court of Appeals of Texas, Beaumont.

Submitted Oct. 11, 2001.

Decided Nov. 29, 2001.

John Cornyn, Attorney General, James "Beau" Eccles, Assistant Attorney General, Austin, for appellant.

Eric "Bulldog" Yollick, Yollick Law Firm, P.C., The Woodlands, for appellee.

Before WALKER, C.J., BURGESS and GAULTNEY, JJ.

## OPINION

DON BURGESS, Justice.

Appellee Roger E. Foxall filed suit against appellants Judy Powell, John L. Luther, Bobbe Alexander, Judy Broussard, Gene Ryder, and Ana Bergh,[1] individually and in their official capacities, for defamation and intentional infliction of emotional distress. Appellants filed a motion for summary judgment on the grounds of qualified privilege, official immunity in their individual capacity, sovereign immunity in their official capacity, and insufficient evidence of intentional infliction of emotional distress. The trial court granted summary judgment in favor of appellants on the claim for intentional infliction of emotional distress but otherwise denied relief. In an interlocutory appeal, appellants assert the trial court erred in denying their claims of immunity. See Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(5) (Vernon Supp.2001). In their first issue, appellants query, "does official immunity shield them from individual liability for an error in the newsletter?" Issue two asks, "does sovereign immunity preclude liability against the Defendants in their official capacity?"

The standard of review for denial of a summary judgment is the same as for the granting of a summary judgment. The movant for summary judgment has the burden of showing there is no genuine issue of material fact and it is entitled to judgment as a matter of law. See Nixon v. Mr. Property Management Co., 690 S.W.2d 546, 548 (Tex.1985). In deciding whether a disputed material fact issue precludes summary judgment, evidence favorable to the non-movant is taken as true. Id. at 548–49. Every reasonable inference in favor of the non-movant is indulged and any doubts are resolved in its favor. Id. The movant must either disprove at least one element of each of plaintiff's theories of recovery or conclusively establish each essential element of an affirmative defense. See City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979). If the movant conclusively proves all essential elements of his defense, the burden shifts to the non-movant. See Casso v. Brand, 776 S.W.2d 551, 556 (Tex. 1989). The non-movant must answer that affirmative defense for summary judgment purposes. See Broussard v. Tyler County Hosp., 831 S.W.2d 584, 586 (Tex.App.— Beaumont 1992, no writ).

Appellants' summary judgment evidence includes an affidavit from each appellant, as well as an affidavit from James Zukowksi and Gay T. McAlister. We first summarize this evidence.

James Zukowski, Director of Professional Licensing for the Texas Department of

---

1. Foxall also filed suit against Lindal Page. Page was not a party to the motion for summary judgment filed by defendants and is not included as a party to the notice of appeal.

The record before this court does not reflect Page is no longer a defendant. Accordingly, this opinion cannot operate to effect Page.

Health (TDH), states there are eleven independent boards administratively attached to the TDH that license health care professionals. All post information of interest to their licensees, including recent disciplinary actions by their board, on the internet. Eight, including the Texas State Board of Examiners of Professional Counselors (the Board), mail a newsletter to its licensees containing recent disciplinary actions taken by their respective boards. Each of the eight boards has a staff provided by TDH and each staff uses the same computerized complaint tracking system as the source of data. Zukowski asserts it is reasonable and prudent for board staff to rely on the accuracy of information input into the system.

The boards rely on their staffs to compile relevant data and organize and disseminate the newsletter. Zukowski knows of no board where the members personally edit the newsletter prior to publication. In the seven years Zukowski has held his current position with the TDH, he is aware of no other instance of an inaccuracy in the publication of board disciplinary action against a licensee.

Judy Powell, Judy Broussard, Gene Ryder, Ana Bergh, and Gay T. McAlister are members of the Board. As such they are generally responsible for regulating the practice of professional counselors, licensing practitioners, disciplining practitioners who violate Board rules, and protecting the public by requiring professional adherence to these rules. The Board sends a biannual publication, "The Examiner," to its licensees, containing general Board information regarding its regulatory function, articles of interest to licensees, and the process and results of disciplinary actions taken by the Board. At least since 1995, "The Examiner" has contained a listing of recent disciplinary actions taken by the Board. Ryder and McAlister were not

on the Public and Professional Relations Committee of the Board when the edition in question was published.

The Board meets four times a year. Typically, Board members, led by Broussard, (Chairperson of the Public and Professional Relations Committee), discuss topics and agree on individual responsibility for drafting articles to be included in the upcoming edition of "The Examiner." Matters of additional content, as well as layout, the compilation of recent disciplinary actions by the Board, and the actual publication of the newsletter, are routinely given to the Executive Secretary or his designee. Broussard, Powell, Ryder, Bergh and McAlister all attest these functions had been adequately performed by the Executive Secretary or his designee in the past and they had no reservation in allowing these duties to remain in the Executive Secretary's discretion.

Broussard, Powell, Ryder, Bergh and McAlister all state they do not recall seeing any drafts of the newsletter prior to its dissemination, nor do they recall any reason to believe or suspect that any of the information it contained was incorrect. To the extent of their involvement in the creation of the edition in question, they acted as Board members with every intention being the fulfillment of their duties.

Broussard, Powell, Ryder, and Bergh all aver they do not recall ever meeting Foxall and bear him no ill will. They never had any intention to injure him; they had no knowledge of the falsity of the statement printed in "The Examiner" prior to its publication; they had no knowledge or reason to believe that the method of compiling the names and particulars of recent disciplinary actions would result in the error that occurred. To their knowledge, the method of compilation had never before resulted in an erroneous publication of an offense. McAlister concludes that it is

her belief, from personal knowledge of the actions of Board members and the process of the publication of "The Examiner," that the actions of the Board, particularly members Powell, Broussard, Ryder and Bergh, were reasonable and prudent under the circumstances.

John L. Luther was the Executive Secretary to the Board when the newsletter in question was published. He states the duties he assigned or delegated to Bobbe Alexander allowed for personal discretion. Alexander is the Program Supervisor of the Board and acts as Administrative Assistant to the Executive Secretary. Luther has discretion over intake and investigation of complaints. He shared discretion over this initial intake of complaints, referral to investigation, and determination of whether to recommend pursuit of an adverse licensing action with Alexander.

Complaints against licensees were addressed to the Board, and upon receipt, Alexander and Luther would make a threshold determination as to whether the complaint articulated a rules violation. Alexander and Luther had the discretion to order investigation of a complaint, determine jurisdiction of a complaint, or recommend closure of the matter. Following completion of an investigation, they maintained the discretion to make a recommendation to the Board regarding action on the complaint.

To assist the Board and staff, a computer-based system was used, called the Complaint Tracking System (CTS). CTS allowed for cataloging incoming complaints and updating their status as they progressed through the administrative system. When a complaint arrived, it was given to the Administrative Technician responsible for maintaining the CTS. A new file was opened in the CTS, showing the name of the complainant, the licensee who was the subject of the complaint, a category number that designated the type of offense/Board rule alleged to have been violated, and the status of the complaint. The status of the file would be "open" at the start of this process. From March of 1999 through early March 2000, Lindal Page was primarily responsible for operating CTS.

Typically, when a complaint satisfied either or both the judgment of Alexander or Luther as demonstrating a violation of Board rules, an investigation was requested. Following the investigation, Luther and Alexander would review the results and determine whether to recommend further action or closure of the complaint. If a recommendation of discipline was made to the Complaints Committee, and approved by the Committee, the CTS would be updated to reflect the recommended action. Thus, the CTS would then show an "open" status case, with an action against a licensee, classified by the rule alleged to have been violated.

At some time after the Committee approval stage, a notification letter would be sent by Luther informing the licensee of a pending action and his options in protesting it. If closure of the file were recommended to the Committee, and accepted, the file would be designated "closed" without notation of any action.

If action against a licensee was approved by the Committee, the licensee would have the opportunity to agree to the recommended discipline, or request an administrative process that included an informal settlement conference and/or a hearing before the State Office of Administrative Hearings (SOAH). The decision by the SOAH officer would then be presented to the Board for approval. Following the full administrative process, or agreement by the licensee to proposed action by the Board, an update of whatever action was

to be taken against the licensee would be input into the CTS, and the status of the case would be changed to "closed."

In April and May of 1999, the Board received two complaints alleging Foxall had improperly engaged in a dual relationship with one of his clients by attempting to secure book and movie rights to the client's private life while she was engaged in therapy with him. One of the complaints was filed by Foxall's employer, the other by his client. Alexander and Luther determined a rules violation had been committed and referred the matter for further investigation. The results of that investigation led to their presentation of the case to the Complaints Committee for consideration of disciplinary action. The Committee recommended a one-year probated license suspension. The Board adopted the actions of the Committee, with no names of licensees mentioned to the Board, pursuant to policy, and the following Monday, Alexander gave her notes of the Committee's actions to Lindal Page for her to update the CTS.

After Lindal Page vacated her position in early March, 2000, Luther assigned Alexander to draft information and compile the data necessary to publish the Spring edition. Alexander prepared the disciplinary action section to be included in the March 2000 edition of "The Examiner." To gather the necessary data, Alexander requested a report from CTS showing all "closed" cases describing actions against licensees between the months of September 1999 and March 2000. The report generated by CTS included four names, each of which had CTS files indicating final or "closed" sanctions or actions received for violations of the Board regarding sexual misconduct and various levels of punishment. Foxall was one of the names appearing in this report.

According to Alexander, at least three mistakes must have been made. First, at some point after the creation of one of Foxall's CTS complaint files, the rule violation was entered as "sexual misconduct" rather than "dual relationship." Second, following input of the recommended discipline, the status designation in the CTS was improperly changed from "open" to "closed." Third, Lindal Page vacated her position in early March of 2000. Page had been responsible for inputting data into the CTS during the relevant time period and had she been present when the report was generated, might have recognized the error. Alexander did not.

Luther reviewed drafts before it was sent for printing and mailing, but did not recognize the inclusion of Foxall's name in the disciplinary section as an error. Luther recalls some technical problems with the physical assembly of the documents for printing and mailing, and the newsletter was not sent out until the first week of May, 2000.

Between April of 1999 and March of 2000, Alexander and Luther reviewed well over a hundred complaints, and presented complaints to the Board regarding dozens of licensees. The most prevalent Board rule violation resulting in discipline is the rule regarding sexual misconduct. At no time prior to the publication and dissemination of "The Examiner" did Luther or Alexander realize the error. Neither Luther nor Alexander recall having ever personally met Foxall, and bear him no ill will. They deny any intention to injure him; they had no knowledge or reason to believe that the method of compiling the names and particulars of recent disciplinary actions would result in the error that occurred. To their knowledge, the method of compilation had never before resulted in an erroneous publication of an offense.

Following notification of the error by Foxall, Luther immediately worked to remedy the error by drafting and sending a personal retraction of the notice to every recipient of the March 2000 edition. Luther drafted and sent Foxall a personal apology, spoke on the phone with his employer and explained the error and sent a letter of retraction to his employer. Luther offered to Foxall to contact anyone he wished to explain the publication error.

In response to appellants' motion for summary judgment, Foxall submitted as evidence Chapter 503 of the Texas Occupations Code; Chapter 681 of the Texas Administrative Code; portions of the depositions of Luther, Alexander, Broussard, Powell, and Ryder; and Foxall's affidavit. Foxall's response asserts appellants are not entitled to either official immunity or sovereign immunity because the acts of officials which are not lawfully authorized are not acts of the State. He further claims appellants are not entitled to official immunity because there is a fact issue as to good faith.

## SOVEREIGN IMMUNITY

■■■ Absent legislative consent to sue or waiver of sovereign immunity, the State of Texas, its agencies, and its officials are protected from suit. *See City of Cockrell Hill v. Johnson,* 48 S.W.3d 887 (Tex. App.—Fort Worth 2001, pet. denied). Foxall filed suit against appellants "in their official capacities" but did not plead waiver or raise it in his response to appellants' motion for summary judgment.[2] Foxall's only argument against the application of sovereign immunity is that it "[does] not cover unauthorized or illegal acts." Foxall contends that because there

is no express authorization for the Board to publish in a newsletter the disciplinary actions taken, the Board improperly exceeded its authority and is therefore not immune. Foxall relies upon *Camacho v. Samaniego,* 954 S.W.2d 811 (Tex.App.—El Paso 1997, writ denied). In *Camacho,* the court was considering on remand the effect of the Texas Supreme Court's declaration that the fee being collected by the county was illegal. *See Camacho v. Samaniego,* 831 S.W.2d 804, 805 (Tex.1992). There has been no comparable declaration that newsletters of the type involved here are unauthorized. The legislature has expressly authorized state agencies to use appropriated money to publish newsletters. *See* TEX. GOV'T CODE ANN. § 2113.107(b)(6) (Vernon 2000). The Board is directed to "prepare and disseminate consumer information." *See* TEX.REV.CIV. STAT. ANN. ART. 4512g, § 6(e)(9) (Vernon Supp.1998).[3] Absent any authority to the contrary, we find it within the Board's discretion to inform consumers of the disciplinary actions taken against its licensees. Accordingly, we find the trial court erred in failing to grant summary judgment in favor of appellants in their official capacity. Issue two is sustained.

## OFFICIAL IMMUNITY

■■■ Official immunity is an affirmative defense. *See City of Lancaster v. Chambers,* 883 S.W.2d 650, 653 (Tex.1994). To be entitled to a summary judgment on that defense, appellants had to establish all the essential elements as a matter of law. *Id.* "The elements of the defense of official immunity are (1) the performance of a discretionary function (2) in good faith (3) within the scope of the employee's authori-

---

**2.** Appellants' brief asserts, and Foxall does not dispute, that his attempts to secure legislative consent for the suit were unsuccessful.

**3.** Act approved May 28, 1999, 76th Leg., R.S., ch. 388 § 1, 1999 Tex. Gen. Laws 1431, 1990 (current version at TEX. OCC.CODE ANN. § 503.251(a) (Vernon Pamph.2001)).

ty." *Kassen v. Hatley,* 887 S.W.2d 4, 9 (Tex.1994).

■ Regarding the first element, an act is not discretionary, *i.e.,* is ministerial, if it requires obedience to orders or the performance of a duty to which the actor has no choice. *See Chambers,* 883 S.W.2d at 654. An act is discretionary if it involves personal deliberation, decision and judgment. *See id.* Investigating and acting on gathered facts is a discretionary function. *See Fowler v. Szostek,* 905 S.W.2d 336, 342 (Tex.App.—Houston [1st Dist.] 1995, no writ).

■ Good faith, the second element, requires this court to look to whether a reasonable official could have believed his or her conduct was lawful in light of clearly established law and the information the official possessed at the time. *See Chambers,* 883 S.W.2d at 656. Thus, qualified immunity will protect all but the plainly incompetent or those who knowingly violate the law. *Id.* The test is one of objective legal reasonableness, without regard to whether the government official acted with subjective good faith. *Id.* The plaintiff must do more than show a reasonably prudent official could have acted otherwise; rather the plaintiff must show no reasonable person in the official's position could have believed the facts justified his actions. *Id.* at 657.

■ The third element, scope of authority, is satisfied if the official is discharging the duties generally assigned to him or her. *See Chambers,* 883 S.W.2d at 658. "The fact that a specific act that forms the basis of the suit may have been wrongly or negligently performed does not take it outside of the scope of authority." *Koerselman v. Rhynard,* 875 S.W.2d 347, 350 (Tex.App.—Corpus Christi 1994, no writ).

■ The evidence clearly established appellants' were performing a discretionary function within the scope of their authority. Foxall's only challenge is to the good faith element to which he contends a fact issue has been raised. Appellants' evidence established the error occurred because incorrect data was entered into the CTS. The record contains no explanation for that lapse. Appellants' evidence further established the reliance placed upon the accuracy of the report generated by CTS was reasonable. Foxall's evidence does not demonstrate no prudent person could have reasonably relied on the accuracy of the report. Thus, he has failed to raise a fact issue precluding summary judgment. Issue one is sustained.

The judgment of the trial court is reversed and rendered in favor of appellants.

**REVERSED AND RENDERED.**